**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **TERI RENE EDWARDS** | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **AMAZON LOGISTICS, INC.** | § | |
| **AMAZON.COM SERVICES, LLC** | § | **CIVIL ACTION NO. 4:23-cv-02037** |
| **AMAZON.COM INC.** | § | |
| | § | |
| *Defendants* | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

---

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SURREPLY TO**
**DEFENDANTS' MOTION TO COMPEL ARBITRATION AND**
**STAY ACTION PENDING ARBITATION**

---

*Of Counsel:*

Warren T. McCollum
Texas Bar No. 24013127
FENLEY & BATE, LLP
P.O. Box 450
Lufkin, Texas 75902-0450
936.634.3346 (Telephone)
936.639.5874 (Fax)
wmccollum@fenley-bate.com


ATTORNEYS FOR DEFENDANTS
AMAZON.COM SERVICES, LLC
AMAZON LOGISTICS, INC.
AMAZON.COM, INC.

Tᴀʙʟᴇ ᴏꜰ Cᴏɴᴛᴇɴᴛꜱ

Pᴀɢᴇ

INTRODUCTION ..................................................................................................1

I.    PLAINTIFF'S EVIDENTIARY OBJECTIONS ARE WITHOUT MERIT......................2

      A.    Hearsay Objections .................................................................................2

      B.    Exhibit 14-1 and the Best Evidence Rule................................................5

II.   AMAZON PROVED THE EXISTENCE OF A VALID AND ENFORCEABLE
      ARBITRATION AGREEMENT........................................................................5

      A.    There is No Material Difference in the Benefit Plans.............................5

      B.    Plaintiff Misreads *Aerotek*.....................................................................6

      C.    There is No Issue With the Time of Signing or IP Address.....................7

      D.    Edwards Has Not Negated the Validity and Enforceability of the
            Arbitration Agreement ..........................................................................12

      E.    Delegation Clause is Not Waived..........................................................14

III.  CONCLUSION AND REQUEST FOR RELIEF................................................15

# TABLE OF AUTHORITIES

CASES                                                                                                    PAGE

*Aerotek v. Boyd*,
   624 S.W.3d 199 (Tex. 2021) ........................................................................6, 7, 13

*Brown v. White's Ferry, Inc.*,
   280 F.R.D. 238 (D. Md. 2012) (mem. op.) ...................................................4

*Capobianco v. City of New York*,
   422 F.3d 47 (2d Cir. 2005) ...........................................................................4

*Henderson v. Black Elk Energy Offshore Operations, LLC*,
   No. H-15-1024, 2018 WL 8452482, 2018 U.S. Dist. Lexis 239355 (S.D. Tex. June 26, 2018). ...................................................................................................3

*In re State Farm Lloyds*,
   520 S.W.3d 595 (Tex. 2017) .........................................................................6

*In re Weekley Homes, L.P.*,
   295 S.W.3d 309 (Tex. 2009) .........................................................................6

*Motor Club of Am. Ins. Co. v. Hanifi*,
   145 F.3d 170 (4th Cir. 1998) ........................................................................4

*PNC Bank, N.A. v. Ruiz*,
   No. 22-50584, 2023 WL 3340078, 2023 U.S. App. Lexis 11505 (5th Cir. May 10, 2023) ......4

*Rock v. Huffco Gas & Oil*,
   922 F.2d 272 (5th Cir. 1991) ........................................................................2

*United States v. Rose*,
   590 F.2d 232 (7th Cir. 1978) ........................................................................5

*Williams v. Illinois*,
   567 U.S. 50, 69 (2012) ..................................................................................3

*Wilson v. Zapata Off-Shore Co.*,
   939 F.2d 260 (5th Cir. 1991) ........................................................................4

**Statutes**

Tex. Bus. & Com. Code § 322.009(a) ...........................................................7

**Rules**

Fed. R. Evid. 703 ...................................................................................................3

Fed. R. Evid. 803(6)............................................................................................2, 3, 4

**Articles**

Aparna Bhattacharya, *The Impact of Carpenter v. United States in Digital Age Technologies*,
    29 S. Cal. Interdis. L.J. 489 (2020)..............................................................................12

## TABLE OF AUTHORITIES
### (Continued)

Fan Jinghe & Tang Wenhan, *China Law Update: A Balance Between Social Media Users' Personal Information Protection and Combating (Mis) and (Dis)information in China*,
    14 Tsinghua China L. Rev. 321 (2022)........................................................................12

Cale Guthrie Weissman, *What is an IP Address and What Can it Reveal About You?*,
    Business Insider (May 18, 2015), https://www.businessinsider.com/ip-address-what-they-can-reveal-about-you-2015-5...............................................................................................12

Nicholas O'Donnell, *Have We No Decency? Section 230 and the Liability of Social Media Companies for Deepfake Videos*,
    2021 U. Ill. L. Rev. 701 (2021)....................................................................................14

Matthew V. Kulger & Carly Pace, *Deepfake Privacy: Attitudes and Regulation*,
    116 Nw. U. L. Rev. 611, at Abstract (2021)................................................................14

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **TERI RENE EDWARDS** | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| **vs.** | § | **CASE NO. 4:23-CV-2037** |
| | § | |
| **AMAZON LOGISTICS, INC.** | § | |
| **AMAZON.COM SERVICES, LLC** | § | |
| **AMAZON.COM INC.** | § | |
| | § | |
| *Defendants* | § | |

---

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SURREPLY TO
DEFENDANTS' MOTION TO COMPEL ARBITRATION AND
STAY ACTION PENDING ARBITRATION**

---

Defendants **AMAZON LOGISTICS, INC.**; **AMAZON.COM SERVICES, LLC**; and

**AMAZON.COM, INC** (collectively, "Defendants" or "Amazon") file this Response to Plaintiff

**TERI RENE EDWARDS'** ("Plaintiff" or "Edwards") Sur-reply to Defendants' Motion to

Compel Arbitration, and respectfully would show as follows:

**INTRODUCTION**

On October 17, 2023, Defendants filed a Motion to Compel Arbitration and Stay Action

Pending Arbitration ("Motion to Compel") (Doc. No. 11). On November 7, 2023, Plaintiff filed

her Response to Motion to Compel Arbitration and Stay Action Pending Arbitration ("Response")

(Doc. No. 13). Defendants then timely filed their Reply to the Response ("Reply") (Doc. No. 14)

on November 17, 2023. On January 29, 2024, two months after Defendant filed their Reply,

Plaintiff filed her Unopposed Motion for Leave to File a Sur-reply to the Reply (Doc. No. 17) and

the next day filed her Sur-reply ("Sur-reply") (Doc. No. 20).

1

## ARGUMENT

### I.   PLAINTIFF'S EVIDENTIARY OBJECTIONS ARE WITHOUT MERIT.

#### A.   Hearsay Objections

Under the Federal Rules of Evidence ("FRE"), a record is exempt from the rule against hearsay if:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). This exception to the general hearsay rule is commonly known as the "business records exception." It exists because it is generally accepted that "business records are reliable because they are created on a day-to-day basis and the 'very regularity and continuity of the records are calculated to train the recordkeeper in habits of precision.'" *Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 279 (5th Cir. 1991) (quoting *McCormick on Evidence* § 306 at 872 (3rd ed. 1984)).

Undergirding all of Plaintiff's hearsay objections is the fact that Defendants' declarants relied on records of which they did not have personal knowledge. (*See* Doc. No. 20 at 7-13). However, each record on which the declarants relied was created in the regular course of Amazon's business and properly offered to the Court by a qualified witness. Therefore, the records are presumptively valid. *See Rock*, 922 F.2d at 279. Plaintiff presents conclusory assertions that the

records are untrustworthy but fails to establish "that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness," as required by Fed. R. Evid. 803(6).

### 1.    The Declaration of David Cowen

Plaintiff relies on *Henderson v. Black Elk Energy Offshore Operations, LLC* for the assertion that David Cowen's expert testimony is inadmissible. No. H-15-1024, 2018 WL 8452482, 2018 U.S. Dist. Lexis 239355 (S.D. Tex. June 26, 2018), *aff'd*, 783 Fed. App'x 380 (5th Cir. 2019). Specifically, Plaintiff cites *Henderson* for the proposition that "an expert may not testify as a lay witness regarding the existence of potentially dispositive facts of which he has no personal knowledge." (Doc. No. 20 at 9) (citing *Henderson*, 2018 U.S. Dist. Lexis 239355, at *1). But *Henderson* actually negates Plaintiff's objection. First, Cowen is testifying at all times as an expert witness, not as a lay witness. Second, "[FRE] 703 allows an expert to base an opinion on inadmissible facts and data." *Henderson*, 2018 U.S. Dist. Lexis 239355, at *3. "It has long been accepted [in the common law] that an expert witness may voice an opinion based on facts concerning the events at issue in a particular case even if the expert lacks first-hand knowledge of those facts." *Williams v. Illinois*, 567 U.S. 50, 67 (2012). "Modern rules of evidence continue to permit experts to express opinions based on facts about which they lack personal knowledge[.]" *Id.* at 69.

### 2.    The Declaration of Mark Brown

Mark Brown's declaration (Doc. No. 14-4) is submitted in an effort to explain the confusion surrounding the timestamp of Plaintiff's signature on the arbitration agreement. Specifically, Brown clarifies statements he made in his first declaration. He establishes that the

"- 5'00'" signifies a time difference between the Plaintiff's local time and the time utilized by Defendants' servers. (*Id.* at 4 ¶6).

### 3.    The Declaration of Jeff Cravalho

Under well-established Fifth Circuit precedent, in proving the business-record exception to the hearsay rule, "there is no requirement that the witness who lays the foundation be the author of the record or be able to personally attest to its accuracy.'" *PNC Bank, N.A. v. Ruiz*, No. 22-50584, 2023 WL 3340078, at *3, 2023 U.S. App. Lexis 11505, at *8 (5th Cir. May 10, 2023) (per curiam) (quoting *United States v. Brown*, 553 F.3d 768, 792 (5th Cir. 2008)); *see Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 272 (5th Cir. 1991) (same) (citing *Rosenberg v. Collins*, 624 F.2d 659, 665 (5th Cir. 1980)). Thus, Jeff Cravalho need not have extensive personal knowledge of the records attached to his declaration. He need only show, as he did here, that the records he seeks to introduce are kept in the course of a regularly conducted activity of the business at which he is employed.[1]

### 4.    There is no double hearsay.

"Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person." *Wilson*, 939 F.2d at 271. However, if every participant in the chain producing the record is acting in the regular course of business, the double hearsay is excused under Fed. R. Evid. 803(6). *Id.* Each record attached to Mr. Cravalho's declaration (Doc. No. 14-6) was created by Defendants' employees in the regular course of business. As we saw above, business records created in the regular course of business are

---

[1] The MyDocs records that Plaintiff objects to are attached to Scott Greene's affidavit as Exhibit 1G. (Doc. No. 20-1 at 38-41). *See Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) ("Hence, defendants waived any objections to the admissibility of the reports by offering them themselves."); *see also Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170, 175 (4th Cir. 1998) (finding that a party waived objection to admissibility of evidence when the party presented the same evidence to the court in its own filing); *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 243 (D. Md. 2012) (mem. op.) (finding same).

presumptively valid, and thus the declarant providing them need not have personal knowledge of them. *See id.*

### B.    Exhibit 14-1 and the Best Evidence Rule

Plaintiff objects to certain evidence filed with Defendants' Reply Brief because, she asserts, the evidence does not comply with the best evidence rule. To the extent Plaintiff implies that Cowen's expert opinion is invalid because it is based on a review of documents not in their native format, Plaintiff is mistaken. Mr. Cowen's opinion is based on his review of the original documents, not a duplicate or altered version.

Plaintiff argues that because there is no applicable federal statute or rule of evidence, Defendants must present the comparator employee records in their unredacted form or risk a finding of inadmissibility. Plaintiff's construction of the rule is misguided. "The so-called 'best evidence rule,' . . . requires only that a party seeking to prove the contents of a document introduce the original document *or explain why it cannot be produced*." *United States v. Rose*, 590 F.2d 232, 237 (7th Cir. 1978) (emphasis added).

Defendants have explained to Plaintiff why the native version of the comparator employee records cannot be produced. (*See* Doc. Nos. 16-3 & 16-4). The comparator employee records contain sensitive identifying information about the employees that are the subject of the records. Defendants have offered a workaround for this issue. (*See* Doc. No. 16-4). Defendants have offered to provide the metadata for the records to allow Plaintiff's expert to confirm that—other than redacting personal information—the native format of the records has not been altered. Plaintiff has never responded to this offer.

## II.    AMAZON PROVED THE EXISTENCE OF A VALID AND ENFORCEABLE ARBITRATION AGREEMENT.

### A.    There is No Material Difference in the Benefit Plans.

Contrary to Plaintiff's contention, Defendants do not rely on a different version of the benefit plan. (*See* Doc. No. 20 at 13). As explained in Defendants' Reply Brief, the updated version of the benefit plan was provided simply to explain the difference in effective dates. (Doc. No. 14 at 19-24). Plaintiff's assertion that the benefit plan filed with the Reply Brief is materially different than the benefit plan filed with Defendants' Motion to Compel Arbitration is baseless and disingenuous. If any material differences existed, Plaintiff would have pointed them out to the Court. Instead, she merely makes an unsupported and conclusory allegation that the "new benefit plan differs materially from the plan originally attached to [the Motion to Compel]." (Doc. No. 20 at 14). Plaintiff does not point to, nor could she, any provision of the benefit plan attached to Defendants' Reply Brief that is materially different in any way. This is so because the only differences between the two documents are stylistic and immaterial.

**B.    Plaintiff Misreads *Aerotek.***

Plaintiff contends that "Amazon improperly asserts that metadata is not required to prove the authenticity of Ms. Edwards' signature" on the arbitration agreement. (Doc. No. 20 at 16). In making this argument, Plaintiff adds language into the Texas Supreme Court's recent decision in *Aerotek, Inc. v. Boyd* that does not exist. 624 S.W.3d 199 (Tex. 2021). In fact, the word "metadata" does not appear in the opinion. *See id.* at 200-15. Because *Aerotek* was decided in 2021, the Texas Supreme Court was certainly aware of the existence of metadata. *See, e.g.*, *In re State Farm Lloyds*, 520 S.W.3d 595, 601 (Tex. 2017) (orig. proceeding) ("Metadata, colloquially known as data about data, encompasses the structural information of a file that contains data about it as opposed to describing its actual substantive content." (internal quotation marks omitted)); *In re Weekley Homes, L.P.*, 295 S.W.3d 309, 320 (Tex. 2009) (discussing metadata in the context of a discovery request). If the Court believed that metadata was required to prove up a digital signature, it would

6

have said so. While metadata certainly is one way to prove up an electronic signature, the suggestion that it is the *only* way to do so is a patent misreading of the law. *Aerotek* instead recognized that the standard is more akin to a totality-of-the-circumstances review. *See Aerotek*, 624 S.W.3d at 205 ("[Proof of an electronic signature] may be shown in *any manner*, including showing the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable." (emphasis added)) (quoting Tex. Bus. & Com. Code § 322.009(a)). Further, even if Plaintiff's reading of *Aerotek* were correct, Defendants *have* provided metadata for all of Plaintiff's records, which include the arbitration acknowledgment in question. Defendants have thus provided sufficient evidence to establish that Plaintiff electronically signed the arbitration agreement.

Finally, Plaintiff continues to complain that Defendants have not provided a "Final Audit Report" in relation to Plaintiff's signature on the arbitration agreement. (Doc. No. 20 at 15). This issue was addressed in Defendants' Reply Brief. (Doc. No. 14 at 14-15). Not all documents signed with Adobe Sign are the same, nor will they all have the same level of information attached to them. Adobe allows its users to customize the amount of information that is tracked via certain settings, and in this case the information Plaintiff's expert identifies in his affidavit was not tracked. That does not mean that the information that *was* tracked is somehow invalid or insufficient to prove that Plaintiff signed the arbitration agreement.

### C.    There is No Issue With the Time of Signing or IP Address

7

Plaintiff takes issue with Defendants' conversion from Coordinated Universal Time ("UTC") to Central Daylight Time ("CDT")[2]. Plaintiff is correct that Defendants' Reply Brief converted UTC to CDT inaccurately (*see* Doc. No. 14 at 6 & 12), but Plaintiff is incorrect that the inaccurate conversion creates an issue. (*See* Doc. No. 20 at 7-9). The undersigned counsel misunderstood the meaning of "15:07 – 5." provided in Adobe properties of the arbitration acknowledgment. The server that stores both Acknowledged Documents and Adobe Signed documents is configured to UTC. CDT is 5 hours *behind* UTC. For example, 20:07 UTC converts to 15:07 CDT. All the documents Plaintiff signed were signed between 14:34 (2:34 p.m.) and 15:20 (3:20 p.m.) CDT with corresponding UTC values of 7:34 p.m. UTC and 8:20 p.m. UTC. (*See* Doc. No. 14-6 (Ex. 4B to Defendants' Reply)). The undersigned misunderstood the "– 5" in "15:07 – 5" to reflect the time of signing when it merely means that a server set to UTC reflects a time that is five hours *later*. (Ex. 1, Declaration of Cowen ¶ 5). The server being set to UTC corresponds with the Plaintiff electronically acknowledging the arbitration agreement at 15:07 as reflected in the properties of the arbitration acknowledgment, as shown here. (Doc No. 11-3 ¶5).

---

[2] Except for its two westernmost counties, Texas is entirely located in the Central Time Zone. Central Time is called "Central Standard Time" when daylight savings is not being observed, and "Central Daylight Time" when daylight savings is being observed. In 2020, the United States observed daylight savings time from March 8 through November 1.



However, the method used to calculate the time Plaintiff signed the arbitration acknowledgment is ultimately irrelevant because Plaintiff could have signed it at any time on April 16, 2020. Plaintiff says that it would have been impossible for her to have signed the arbitration acknowledgment at 15:07 because she would have been in the middle of her workday with the Harris County Toll Authority. (Doc. No. 13 at 11-12). Specifically, Plaintiff claims her job with the Harris County Toll Authority "forced [her] to work each day until 5:00 p.m. without a lunch break." (*Id.* at 11). Therefore, Plaintiff claims, "[t]here was no opportunity during that workday to review the new-hire documents." (*Id.*).

But, Plaintiff conveniently fails to mention that starting in March of 2020, she worked from *home*. (*See* Exhibit 2 attached hereto at 48:5 – 48:23). Further, and more importantly, Plaintiff's work hours were not set by Harris County Toll Authority to be 9 a.m. to 5 p.m. (*Id.* at 49:11 – 50:6). In fact, Plaintiff was free to choose any working hours she preferred, as long as she completed her assigned number of license-plate reviews for the day before 11:59 p.m. (*See id.*). As Plaintiff testified:

> It -- the day started at 12:01 a.m. to [sic] 11:59 p.m. Within that time frame, you
> had to do eight hours. So you could go and do something that -- you know, run an

[sic] errands or whatever and then come back online. I liked to have my time in the evening, so I tried not to do that. But, you know, if a girlfriend called and said let's go out to eat, I would get as much done as I could done [sic], and then I would come back and finish out my -- my shift.

(*Id.* at 49:22 – 50:6).

Plaintiff's testimony reveals two important points. First, her work assignments with the Harris County Toll Authority were not so pressing or stringent that she was "forced [] to work each day until 5:00 p.m. without a lunch break." To the extent Plaintiff worked any given day straight through until 5 p.m. without taking a break, it would have been because she *chose* to work straight through the workday—a choice she was free *not* to make on any other day. Plaintiff admits as much in the above-quoted testimony—sometimes she would decide to go to lunch or run errands and finish her work afterward. Although she "tried not to do that," she testified that on some days she *does* take breaks from her work and directed her attention to something else.

The second important point is that, given the short amount of time it took Plaintiff to acknowledge the documents at issue and the flexible nature of her work-from-home position on April 16, 2020, she easily could have acknowledged the documents during the workday. And the ease with which Plaintiff could have done this was enhanced by the fact that she used her personal computer to perform her work. (*Id.* at 80:8 – 80:11). Moreover, Plaintiff acknowledged that when she received the email from Amazon on April 16, 2020, advising her that she needed to complete her pre-employment documents, and realized that she missed a similar email from Amazon on April 14, 2020, she "finished up what [she] was doing and went in and filled that out" that day.

10

(*Id.* at 57:24 – 58:22). It does not matter what time of day Plaintiff asserts she signed the documents—she would have been home and had the ability to complete them.[3]

Plaintiff admits a second time that she *did* execute employment paperwork for Amazon on April 16, 2020; she just does not recall seeing the arbitration agreement. (*See id*. at 59:4 – 59:12) ("**Q.** So you don't deny that you executed some employment paperwork April 16, 2020? **A.** I remember specific documents that I thumbed through and looked before I hit the okay button. I can't remember now of how they did that or accept button. [sic] **Q.** Okay. **A.** And I do not remember that arbitration agreement."). It makes little sense for Plaintiff to have executed each and every Amazon document on April 16, 2020, *except* for the arbitration acknowledgment. Rather than offer an explanation, Plaintiff can only say that she does not remember signing it. That is because she executed the acknowledgement at the same time as the other documents. Plaintiff is using the confusion surrounding the UTC conversion as a red herring to distract the Court from the fact that she signed the arbitration acknowledgment. That there is a slight dispute about the *exact time of day* the documents were signed is not evidence that Plaintiff did not sign the documents or agree to be bound by them.

Apart from the time of signing, Plaintiff's Sur-reply suggests there are two other issues with the IP address Defendants provided to show that she signed the arbitration agreement: (1) the IP address, when plugged into a website, provides latitude and longitude coordinates for an establishment in Downtown Houston rather than Plaintiff's residence; and (2) "Amazon's

---

[3] Plaintiff also states in her affidavit that she never signs her name "Teri Rene Edwards," and that she always signs "T. Rene Edwards." (Doc. No. 13-2 at ¶5). However, her personnel file with Harris County Toll Road Authority reveals multiple times when she signed documents with "Teri Rene Edwards," which directly contradicts her statements. (Ex. 2 at 61:19 – 63:16). Of note, the Plaintiff was questioned by her attorney at the conclusion of the deposition in relation to her signature, but no effort was made to address the contradictions between her deposition testimony as to flexible work schedule and her affidavit and briefing claiming a rigid work schedule (Ex. 2 at 193:22 – 199:17).

purported 'search' for the IP address amounts to nothing more than a search of the [sic] WhatIsMyIPAddress.com." (Doc. No. 20 at 20). Plaintiff does not understand the nature of the information that is gleaned from an IP address. Although, an IP address is, under the right circumstances, capable of identifying the relative location of a user, consumer-facing websites are generally unable to do so. *See* Ex. 1, Declaration of Cowen ¶4; *see also* Aparna Bhattacharya, *The Impact of Carpenter v. United States in Digital Age Technologies*, 29 S. Cal. Interdis. L.J. 489, 508-09 (2020) ("Viewed alone, IP addresses generally do not reveal much personal information about an individual beyond their general location."); Fan Jinghe & Tang Wenhan, *China Law Update: A Balance Between Social Media Users' Personal Information Protection and Combating (Mis) and (Dis)information in China*, 14 Tsinghua China L. Rev. 321, 324 (2022) ("The most common geographical information that websites can obtain through IP addresses is country, region, city, or time zone."); Cale Guthrie Weissman, *What is an IP Address and What Can it Reveal About You?*, Business Insider (May 18, 2015), https://www.businessinsider.com/ip-address-what-they-can-reveal-about-you-2015-5 ("Alone, the IP address can't share much more about you than a generalized location of where you might [have been] at a certain time.").

Accordingly, with only an IP address and nothing more, the most accurate geolocation one can find is typically the city the user lives in. Thus, the fact that the longitude and latitude coordinates Plaintiff received when plugging the IP address into the website do not point to Plaintiff's residence is not material. It is not probative evidence that Plaintiff did not sign the arbitration acknowledgement on April 16, 2020.

### D. Edwards Has Not Negated the Validity and Enforceability of the Arbitration Agreement.

In attempting to show that her affidavit amounts to more than a claim that she does not believe she signed the arbitration agreement, Edwards unintentionally does just that. The three

examples Plaintiff uses as evidence that she did more than claim she did not sign—(1) that she did not sign "to the best of her knowledge," (2) that she would not have signed at the time shown, and (3) that she would not have signed her name the way it shows on the document (Doc. No. 20 at 22), all amount to a lack of certainty (when read together with her deposition testimony that Plaintiff possessed workplace flexibility) as to whether she signed the arbitration acknowledgment.

Plaintiff points to her expert's ability to create a falsified arbitration agreement as a sort of trump card that somehow definitively proves she did not sign the arbitration agreement. (Doc. No. 20 at 22-23). Based on this exercise by her expert, Plaintiff warns the Court that if it agrees with Defendants, it would be in danger of allowing Defendants "to create a dangerous federal precedent that would ostensibly bind any person to any agreement that Amazon wishes to enforce." (*Id.*). Besides the fact that this statement is both pure conjecture and hyperbole, that a fake arbitration agreement similar to the one at issue can be "created" has no bearing on whether *Plaintiff's arbitration agreement* was falsified. Conjecture and hyperbole correctly describe the foundation of Plaintiff's argument. Because her expert in technology, computers, and digital forensics can recreate a convincing copy of the agreement at issue, Defendants must have, as well.

But, a *wet ink signature*, in the hands of a person with the right skillset and the proper tools, can just as easily be falsified. That is why the courts have established standards like those the Texas Supreme Court set out *Aerotek* to ensure the authenticity of an electronic signature. Surely, Plaintiff is not advocating a rule that it would be improper to attribute a wet ink signature to someone who claims they did not sign an agreement—especially when there is probative evidence besides the signature itself tying that person to the agreement. And here, Defendants have provided the Court with probative evidence to prove that the signature on the arbitration agreement belongs to Plaintiff.

13

Plaintiff has, at most, shown that the agreement at issue is *capable* of being forged – that it is *possible*. And perhaps it is. But, the possibility is an unfortunate reality of the world in which we live. Almost anything can be forged in the modern era. *See* Nicholas O'Donnell, *Have We No Decency? Section 230 and the Liability of Social Media Companies for Deepfake Videos*, 2021 U. Ill. L. Rev. 701 (2021) (discussing the growing epidemic of artificial, but realistic and convincing videos depicting people doing or saying things they have never done); Matthew V. Kulger & Carly Pace, *Deepfake Privacy: Attitudes and Regulation*, 116 Nw. U.L. Rev. 611, at Abstract (2021) ("Using only a series of images of a person's face and publicly available software, it is now possible to insert the person's likeness into a video and show them saying or doing almost anything.").

But simply arguing that Plaintiff's signature *could* be inauthentic is not the same as arguing that her signature *is* inauthentic. Defendants have met their burden of proving that the arbitration agreement is what it purports to be – an enforceable agreement signed by Plaintiff. Plaintiff, to escape her obligations under the agreement, bears the burden of establishing that the agreement *is* falsified, not that it *could be*. Plaintiff has not met her burden – her arguments are based solely on mere surmise, conjecture and possibility.

### E.    Delegation Clause is Not Waived

Despite Plaintiff's assertions otherwise, Defendants did not contend in their Motion to Compel that the delegation clause "empowers the appointed arbitrator, rather than the Court, to determine the existence and validity of an agreement to arbitrate." (Doc. No. 20 at 24). Rather, Defendants correctly pointed out that where an arbitration agreement contains a valid delegation clause, the court's *sole* obligation is to determine the existence and validity of an agreement to arbitrate. (*See* Doc. No. 11 at 16) (arguing that there is a valid delegation clause delegating

14

authority to the arbitrator to decide issues of arbitrability; "[a]ccordingly, the *sole issue remaining [for the court] is whether Amazon's Agreement is valid*[.]") (emphasis added). A correct reading of Defendants' Reply Brief reveals that Defendants are in fact arguing that the issue of *ambiguity* is delegated to the arbitrator. (Doc. No. 14 at 19).

Further, Defendants do not "assert[] a new delegation argument in its Reply" as Plaintiff asserts. (Doc. No. 20 at 24). Defendants' argument remains consistent in its Motion to Compel and Reply Brief—that the arbitration agreement contains a valid delegation clause.

Finally, Defendants do not "recogniz[e] that its delegation clause argument . . . cannot withstand legal scrutiny," as Plaintiff asserts. (*Id.*) The Reply Brief directly disproves Plaintiff's argument. (*See* Doc. No. 14 at 19, "While Amazon believes the delegation clause found in paragraph 6c of the Mutual Agreement to Arbitrate is clear and unmistakable, it is irrelevant."). Defendants did not include the discussion of the Fifth Circuit Court of Appeals' treatment of the American Arbitration Association's ("AAA") rules in its Reply Brief to change the source of delegation in support of their arguments, but to show that Plaintiff's argument against delegation is meritless. But even if the Court were to find that the delegation clause in the arbitration agreement is inoperative, the agreement's incorporation of the AAA rules creates a clear and unmistakable intent to delegate decisions of arbitrability to the arbitrator.

### III.
### CONCLUSION

The probative evidence and applicable law establish that a valid, enforceable arbitration agreement exists between Defendants and Plaintiff and that Plaintiff's claims fall within the scope of the agreement. And under the agreement's delegation clause, any remaining issues regarding the agreement, its procedures, or its coverage are for the arbitrator to decide.

WHEREFORE PREMISES CONSIDERED, Defendants, **AMAZON LOGISITICS, INC., AMAZON.COM SERVICES, LCC, AND AMAZON.COM, INC.**, respectfully request this Court grant Defendants' Motion to Compel Arbitration and Stay Action Pending Arbitration. Defendants additionally request any other and further relief to which they have shown themselves to be justly entitled.

Respectfully Submitted:

/s/Warren T. McCollum
WARREN T. MCCOLLUM
Texas SBN:    24013127
FENLEY & BATE, L.L.P.
P.O. Box 450
Lufkin, Texas 75902-0450
TPN:   (936) 634-3346
FXN:   (936) 639-5874
TXSD Admission No.: 769985
Email: wmccollum@fenley-bate.com
ATTORNEY FOR DEFENDANT
**AMAZON.COM SERVICES LLC.**
**AMAZON LOGISTICS, INC**
**AMAZON.COM, INC**

16

## <u>CERTIFICATE OF SERVICE</u>

        This is to certify that I have on this the 2nd day of April 2024, served a true and correct copy of the foregoing to:

| | | |
|---|---|---|
| Jonathan Sneed<br>State Bar No. 89994<br>800 Commerce St.<br>Houston, Texas 77002<br>Email: jsneed@awtxlaw.com | ☐ By certified mail<br>☐ By regular mail<br>☐ By overnight mail<br>☐ By Email<br>☐ By Facsimile<br>☒ By Electronic Delivery | |
| Lauren Harbour<br>State Bar No. 24070649<br>Dana Levy<br>State Bar No. 24031869<br>2638A Rice Blvd, #447<br>Houston, Texas 77005<br>Email: lharbour@dpslawgroup.com<br>      dlevy@dpslawgroup.com | ☐ By certified mail<br>☐ By regular mail<br>☐ By overnight mail<br>☐ By Email<br>☐ By Facsimile<br>☒ By Electronic Delivery | |
| Kirk Pittard<br>State Bar No. 24010313<br>P.O. Box 224626<br>Dallas, Texas 75222<br>Email: kpittard@dpslawgroup.com | ☐ By certified mail<br>☐ By regular mail<br>☐ By overnight mail<br>☐ By Email<br>☐ By Facsimile<br>☒ By Electronic Delivery | |

                                        /s/Warren T. McCollum
                               WARREN T. MCCOLLUM